**THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH**

| | |
|---|---|
| MONICA VIGIL,<br><br>         Plaintiff,<br><br>   v.<br><br>SALT LAKE CITY CORPORATION, a Utah municipal corporation,<br><br>         Defendant. | **MEMORANDUM DECISION AND ORDER DENYING [51] DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING [52] PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:20-cv-00344<br><br>District Judge David Barlow<br>Magistrate Judge Daphne A. Oberg |

Before the court are Plaintiff Monica Vigil's and Defendant Salt Lake City Corporation's cross-motions for summary judgment.[1] Plaintiff's complaint alleges three causes of action: retaliation in violation of Title VII, a violation of the Equal Protection Clause under § 1983, and breach of contract.[2] Plaintiff now stipulates to the dismissal of her remaining breach of contract claim,[3] and both parties move for summary judgment on the two remaining causes of action. For the reasons that follow, the court denies both motions.

## BACKGROUND

At all relevant times, Salt Lake City Corporation operated a golf division under its Department of Public Services.[4] The golf division hired "Golf Relation Specialists" to receive customers, manage the tee sheet, and ring up retail items and green fees.[5] Golf Relation Specialists who were designated as "teaching professionals" could also teach clinics or private

---

[1] ECF Nos. 51, 52, filed Mar. 17, 2023.
[2] ECF No. 21, filed Mar. 11, 2021. This court dismissed Plaintiff's breach of implied contract claim but did not dismiss the breach of express contract claim. *See* ECF No. 14, entered June 10, 2021.
[3] Pl.'s Opp'n 1, ECF No. 56, filed Apr. 14, 2023.
[4] Kammeyer Dep. 5:25–6:19, ECF No. 52-18.
[5] *Id.* at 12:11–12:14.

1

lessons.[6] It was a part-time or seasonal at-will employment position.[7] The course's Head Golf

Professional supervised the position.[8]

Defendant hired Plaintiff as a "Golf Relations Specialist" for the Nibley Golf Course

("Nibley") in March 2011.[9] She was hired by Jeremy Green, Plaintiff's "very close friend," who

knew Plaintiff from her time working at the Mountain Dell Golf Course café.[10] Mr. Green was

the Head Golf Professional at Nibley.[11] Because Plaintiff's job as a Golf Relations Specialist was

seasonal, she would begin work once the weather permitted the golf course to open each spring,

usually around March, and then she would work through December.[12] According to Plaintiff, she

was the longest tenured employee, so she "had seniority as far as the hours went."[13]

*October 18, 2017 Sexual Harassment Complaint*

Around 2017, Plaintiff began teaching clinics[14] as well as private lessons.[15] That summer,

Mr. Green left Nibley to work at Mountain Dell Golf Course.[16] Mike Brimley became the Head

Golf Professional at Nibley.[17] Stacey Camacho was his Assistant Golf Professional.[18]

That October, Plaintiff complained about Mr. Camacho's management style to Liz

Nenni,[19] Defendant's Human Resources representative assigned to the golf division.[20] A day

later, Plaintiff accused Mr. Camacho of sexual harassment ("October 18, 2017 Complaint").[21]

---

[6] *Id.* at 12:14–12:19.
[7] *Id.* at 8:6–8:9, 16:11–16:17.
[8] *Id.* at 16:3–16:10.
[9] Vigil Job History, ECF No. 52-1.
[10] Vigil Dep. 102:3–102:8, 13:1–13:24, ECF No. 51-3.
[11] Kammeyer Dep. 16:5–10.
[12] Vigil Dep. 16:2–16:8.
[13] *Id.* at 16:2–16:9.
[14] Kammeyer Dep. 13:6–13:10.
[15] Vigil Dep. 62:8–62:22.
[16] *Id.* at 40:9–40:14; Investigation Final Report Jan. 9, 2018 at 2, ECF No. 52-6 at 4.
[17] Investigation Final Report Jan. 9, 2018 at 3.
[18] *Id.* at 1, 5.
[19] *Id.* at 4.
[20] Shaffer Dep. 9:7–9:8, ECF No. 52-7.
[21] Investigation Final Report Jan. 9, 2018 at 4; Email from Lovato to Harper Oct. 18, 2017, ECF No. 52-2.

Defendant hired an outside investigator to handle the matter.[22] The investigator concluded that Plaintiff's allegations were "serious and significant" but "at best, the investigation uncovered a she-said/he-said situation, where no other coworkers can substantiate any of the allegations and [Mr.] Camacho denies all sexual harassment."[23] Darlene Harper, Senior Human Resources Consultant for Defendant, informed Plaintiff of the outcome of the investigation on January 22, 2018.[24] Around the same time, Steve Elliot became the Head Golf Professional at Nibley.[25]

*February 12, 2018 EEO Complaint*

On February 12, 2018, Plaintiff emailed Ms. Harper, stating "I've been informed that I need to keep track of and report every act or non-action that I believe is retaliation, harassment, hostile working environment and age or sexual discrimination that continues at Nibley" ("February 12, 2018 Complaint").[26] She stated that on February 4, Myles Borich, a cart range employee, brought a beer into the pro shop and told Plaintiff that he would put it in the fridge for her.[27] Plaintiff told him to take it out of the shop, and Mr. Borich complied.[28] Plaintiff also alleged that on February 8, Brady Hansgren was changing his clothes after his shift and he dressed in front of Plaintiff—pulling up his pants, tucking in his underwear, zipping his zipper, and putting on his belt.[29] Plaintiff also asserted that, later that day, Ronnie Nereen asked Plaintiff if she thought there was anything illegal going on in the parking lot because Mr. Borich's friends were there and they did not appear to be golfers.[30] When Plaintiff asked Mr. Nereen what he

---

[22] Email from Harper to Vigil Dec. 12, 2017, ECF No. 52-5.
[23] Investigation Final Report Jan. 9, 2018 at 5.
[24] Letter from Harper to Vigil, Jan. 22, 2018, ECF No. 52-8.
[25] Kammeyer Dep. 16:5–10; Investigative Report May 29, 2018 at 2, ECF No. 52-12 at 5.
[26] Email from Vigil to Harper, Feb. 12, 2018, ECF No. 52-10.
[27] *Id.*; Investigative Report May 29, 2018 at 3. Mr. Borich is also identified in the record as "Miles" "Borage." Investigative Report May 29, 2018 at 3; Vigil Dep. 19:2.
[28] Email from Vigil to Harper, Feb. 12, 2018, ECF No. 52-10.
[29] *Id.*
[30] *Id*. Mr. Nereen was the assistant golf professional who replaced Mr. Camacho in 2018. Vigil Dep. 18:18–18:24. He is also identified in the record as "Russell Newren." Investigative Report May 29, 2018 at 2.

meant, he stated, "[t]his is not a drug place and he d[id] not want that type of behavior occurring around the golf course."[31] Plaintiff believed this conduct to be retaliation for her sexual harassment complaint.[32]

Defendant investigated Plaintiff's complaint as an allegation of "[r]etaliation" through its Equal Employment Opportunity ("EEO") program.[33] In investigating Plaintiff's complaints, Melissa Green, EEO Program Manager, interviewed Mr. Borich. Mr. Borich said he "found an unopened beer can in a golf cart and offered it to [Plaintiff] because he knows she occasionally drinks beer when not working and he thought it was a 'nice gesture.'"[34] Mr. Hansgren denied changing in front of Plaintiff.[35] The EEO referred Plaintiff's complaint about Mr. Borich's potential drug activity to the Public Services Administration because it did not "implicate e [sic] a potential violation of the City's Anti-Discrimination and Harassment Policy."[36]

Ms. Green concluded that none of Plaintiff's allegations were supported.[37] Her report was sent to Lisa Shaffer, Defendant's Public Services Department Director, on May 30, 2018.[38]

*April 6, 2018 Complaint*

On April 6, Plaintiff reported that she was receiving less hours than her coworkers and when she requested more hours from Mr. Elliot, he told her "she was not wanted in the pro shop" ("April 6, 2018 Complaint").[39] She reported that her coworkers, on numerous occasions, would ignore her, walk away, or give her a minimal reply when she greeted them.[40] She also reported

---

[31] Investigative Report May 29, 2018 at 2.
[32] *Id.* at 1.
[33] *Id.* ("Basis of Charge: Retaliation"); Letter from Green to Shaffer May 30, 2018 at 2, ECF No. 52-12 at 3.
[34] Investigative Report May 29, 2018 at 3.
[35] *Id.*
[36] *Id.* at 6.
[37] *Id.*
[38] Letter from Green to Shaffer May 30, 2018 at 1.
[39] Investigative Report May 29, 2018 at 2.
[40] *Id.*

that, a year previously, Mr. Green had told her he would increase her pay by an additional $1.00 an hour but she did not receive the increase.[41] Plaintiff "alleged other possible policy violations, including drug use by coworkers, inappropriate lesson assignments, failing to list her as an instructor on the website, and smoking in the cart barn."[42] Plaintiff believed this conduct to be retaliation for her sexual harassment complaint.[43]

During her investigation of Plaintiff's retaliation complaint, Ms. Green conducted interviews with Mr. Elliot, Mr. Hansgren, Mr. Borich, Mr. Bowcut, Mr. Green, and Plaintiff.[44] Mr. Bowcut, who was responsible for creating the schedule, said that "his goal is to ensure that shift distribution is even" and that the three Golf Relations Specialists each "receive three pro shop shifts."[45] Mr. Bowcut reported that Plaintiff was the "first person he contacts when he needs additional coverage," and that he had offered her two additional shifts on separate occasions in April, both of which she declined.[46] Mr. Bowcut "acknowledged addressing a few performance issues with [Plaintiff], which he feels she may perceive as him 'singling her out.'"[47] But he denied intentionally ignoring Plaintiff and said that he had been "talkative" with her.[48]

Mr. Hansgren described himself as having been Plaintiff's friend at one point, but beginning in 2016, he began to believe she was making false statements about employees.[49] Although he did not go out of his way to talk with her after 2016, he was always "friendly,

---

[41] *Id.*
[42] *Id.* at 3.
[43] *Id.* at 1.
[44] *Id.* at 3.
[45] *Id.* at 4.
[46] *Id.*
[47] *Id.* at 6.
[48] *Id.*
[49] *Id.* at 5.

respectful, and kind."[50] He ultimately relocated to another golf course after Plaintiff made allegations about him bringing beer into the shop.[51]

Mr. Elliot indicated that Plaintiff's hours had not been reduced, but that there was a chance that poor weather occurred more frequently during her assigned pro shop shifts.[52] He denied telling Plaintiff that she was not welcome in the pro shop and that, "to the contrary, . . . told her he expects her to work in the pro shop" and "would assist her in trying to find a good balance between pro shop hours and teaching hours."[53] Mr. Elliot said that he had not observed Mr. Bowcut, Mr. Borich, or Mr. Hansgren ignoring Plaintiff or treating her negatively.[54] He noted that he recently observed Mr. Bowcut, Mr. Hansgren, and Plaintiff eating a pizza together and "getting along."[55] Mr. Elliot said Plaintiff was earning the same hourly wage as the other Golf Relations Specialists, and Mr. Green recalled having a conversation with Plaintiff about her pay rate, and that they discussed the possibility of Plaintiff working regularly in the pro shop instead of teaching for a $1.00 per hour raise.[56] However, Plaintiff ultimately decided to remain an instructor, according to Mr. Green.[57]

Ms. Green concluded that none of Plaintiff's allegations were supported.[58] Her report was sent to Ms. Shaffer on May 30, 2018.[59]

---

[50] *Id.*
[51] *Id.*
[52] *Id.* at 3–4.
[53] *Id.* at 4.
[54] *Id.*
[55] *Id.*
[56] *Id.* at 6.
[57] *Id.*
[58] *Id.*
[59] Letter from Green to Shaffer May 30, 2018 at 1.

*May 11, 2018 Complaint*

On May 11, Plaintiff made a complaint against Quentin Sasser, another Golf Relations Specialist ("May 11, 2018 Complaint").[60] She alleged that, on June 15, 2016—two years prior—Mr. Sasser engaged in sexually offensive behavior and that Mr. Green improperly handled her subsequent complaint to him about Mr. Sasser's behavior.[61] Ms. Harper investigated the complaint, interviewing Plaintiff, Mr. Sasser, Mr. Green, and two witnesses. Mr. Sasser "admitted that, as a joke and in a 'playing motion,' he picked [Plaintiff] up."[62] He "recall[ed] [Plaintiff] told him she was embarrassed by being picked up and Sasser subsequently apologized to her and stated he 'didn't mean to embarrass [her].'"[63] He "denied touching [Plaintiff]'s breasts and indicated she did not scream or kick when he picked her up."[64] Mr. Green "acknowledged [Plaintiff] notified him of the incident and said she was 'very embarrassed about it,'" but when he asked her if she considered it sexual harassment, she said it was not.[65] In conclusion, Ms. Harper found that neither of Plaintiff's allegations were supported.[66] She sent Ms. Shaffer a letter with her investigation and conclusion on June 11, 2018.[67]

*May 24, 2018 Complaint*

On May 24, 2018, Plaintiff made a complaint about a customer who had purportedly made disparaging comments to her in the presence of her coworkers and a customer ("May 24, 2018 Complaint").[68] She believed the customer made the comments because of her sex.[69] After

---

[60] Investigative Report June 11, 2018, ECF No. 52-13.
[61] *Id.* at 1.
[62] *Id.* at 3.
[63] *Id.*
[64] *Id.*
[65] *Id.* at 3–4.
[66] *Id.* at 4.
[67] Letter from Harper to Shaffer on June 11, 2018 at 1, ECF No. 52-13 at 2.
[68] Investigative Report July 3, 2018, ECF No. 52-20.
[69] *Id.* at 1 ("Vigil alleges Smith made disparaging comments to her in the presence of her coworkers and a customer because she is a woman.").

7

talking to Plaintiff, the customer, Mr. Elliot, and two witnesses, Ms. Harper found that Plaintiff's

allegations that the customer made disparaging comments to Plaintiff *because of her gender*

were not supported.[70] Instead, Ms. Harper found that the customer's comments to Plaintiff were

rude (including a comment that "all of the rumors they are saying about you are true").[71] Mr.

Elliot was "quite shocked" by Plaintiff's reaction to the customer's comments; he reported that

she became "hysterical" and informed Mr. Elliot that she could not teach the scheduled junior

golf clinic that evening.[72] Mr. Elliot encouraged her not to listen to the customer and validated

Plaintiff's actions toward the customer.[73] Ms. Harper reported her findings to Ms. Shaffer on

July 3, 2018.[74]

*Settlement of Plaintiff's October 18, 2017 Sexual Harassment Complaint*

On June 4, 2018, the mediation conference resulted in the parties executing a settlement,

release, and waiver agreement (the "Settlement Agreement").[75] Plaintiff agreed to "fully and

forever release and discharge the City . . . and, as applicable, each of its employees, agents,

affiliates, representatives, and attorneys . . . from and against any and all causes of action, claims,

demands, judgments, liabilities, and obligations (fiduciary, monetary, or otherwise), whether

known or unknown, suspected or unsuspected, accrued or unaccrued, that [Plaintiff] ever had,

currently has, or will ever hereafter have against the City or City Agents and Attorneys from the

beginning of time to the date of execution of this Agreement."[76] In consideration, Defendant

agreed to pay Plaintiff $5,735.00 and for Defendant's Public Services Department Director, Lisa

Shaffer, to hold meetings with Mr. Elliot, Mr. Bowcut, Mr. Green, and Mr. Camacho to discuss

---

[70] *Id.* at 3.
[71] *Id.*
[72] *Id.*
[73] *Id.*
[74] Letter from Harper to Shaffer on July 3, 2018 at 1, ECF No. 52-14 at 2.
[75] Settlement, Release, & Waiver Agreement Between Monica Vigil & Salt Lake City Corporation, ECF No. 51-4.
[76] *Id.* at 3.

Defendant's "commitment to a workplace free of unlawful discrimination, harassment, and retaliation and the importance of treating all individuals with courtesy and respect . . . ."[77] The agreement also contemplated the possibility of a follow-up meeting at Plaintiff's request.[78]

On June 13, 2018, Ms. Shaffer met with Mr. Green in accordance with the Settlement Agreement.[79] The next day, she met with Mr. Elliot and Mr. Bowcut, and on June 15, she met with Mr. Camacho.[80] When Ms. Shaffer asked Plaintiff whether she would like a follow-up meeting, Plaintiff indicated that she would.[81] Ms. Shaffer scheduled follow-ups with Mr. Elliot, Mr. Bowcut, and Mr. Green.[82]

On June 22, 2018, Mr. Bowcut emailed Ms. Nenni, telling her that he had seen Plaintiff "drinking a beer in her ca[r] while she was teaching the Jr golf Class."[83] Ms. Shaffer reached out to Mr. Bowcut and asked him to "write down everything [he] remember[ed] and submit it to [Ms. Nenni] in HR."[84] She told him that this was "a very serious allegation."[85] Mr. Bowcut sent a description of the event, detailing that at about 1:50 pm, he observed Plaintiff drive her cart up to her car.[86] She got into her car and drank out of a Bud Light beer can.[87] She then exited her vehicle, got into the cart, and drove away.[88] The next day, Mr. Bowcut told Plaintiff what he believed he had seen, and she told him "it was pepto not a beer."[89] Mr. Bowcut's allegation was

---

[77] *Id.* at 2.
[78] *Id.*
[79] Email from Shaffer to Vigil July 13, 2018, ECF No. 52-16.
[80] *Id.*
[81] *Id.*
[82] *Id.*
[83] Email from Bowcut to Nenni June 21, 2018, ECF No. 52-17 at 3.
[84] Email from Shaffer to Bowcut June 25, 2018, ECF No. 52-17 at 4.
[85] *Id.*
[86] Email from Bowcut to Nenni and Shaffer June 26, 2018, ECF No. 52-17 at 6.
[87] *Id.*
[88] *Id.*
[89] *Id.*

determined to be "unsubstantiated."[90] It is undisputed that he was not disciplined for the allegation.[91]

On June 29, 2018, Ms. Shaffer, Plaintiff, and Ms. Nenni met with Mr. Bowcut and Mr. Elliot as a follow-up meeting in accordance with the Settlement Agreement.[92] That same day, Mr. Elliot emailed Ms. Nenni saying, "As per our discussion today I am forwarding performance and issues concerning [Plaintiff]."[93] Attached was a list of "[i]ssues and concerns based on notes since March 16."[94] Mr. Bowcut also emailed Ms. Nenni his observations that same day.[95] His notes detailed, by date, Plaintiff's alleged work infractions, questionable judgment calls, unreliability, confrontations with customers, and frequent use of the restroom.[96] In total, he had made 15 entries between March 21 and June 27, 2018.[97]

*July 6, 2018 Complaint*

On July 6, 2018, Plaintiff emailed Ms. Harper a photo of her defaced name plaque at Nibley Park ("July 6, 2018 Complaint"). She wrote that "somebody has vandalized" the signage "by partially gouging out" her name.[98] Ms. Harper informed her that "[t]he concerns you raised are ones usually handled by management" and that Ms. Harper had "reached out to golf administration to make sure they are aware of these specific concerns."[99] While Plaintiff did not know who vandalized her sign, she had "an idea, but [not] any proof."[100] She believed it was Don Carpenter, a cart attendant, who had called Plaintiff "ica" one time, which is what had been

---

[90] Shaffer Dep. 46:9–46:18.
[91] Def.'s Opp'n 13 ("Undisputed that Bowcut was never disciplined . . . ."), ECF No. 54.
[92] Email from Shaffer to Vigil July 13, 2018, ECF No. 52-16.
[93] Email from Elliot to Nenni June 29, 2018, ECF No. 52-19.
[94] *Id.*
[95] Email from Bowcut to Nenni June 29, 2018, ECF No. 52-19.
[96] *Id.*
[97] *Id.*
[98] Email from Vigil to Harper July 6, 2018, ECF No. 52-21.
[99] Email from Harper to Vigil July 9, 2018, ECF No. 52-21.
[100] Vigil Dep. 139:22–139:25.

left of her name on her sign.[101] Plaintiff asked Mr. Elliot to get the cameras working in order to record who was defacing her sign, but he did not get them fixed.[102] The record is mixed as to whether Plaintiff believed the vandalism and Mr. Elliot's non-action regarding the functioning of the security cameras was retaliation for her sexual harassment complaint.[103]

On July 13, 2018, Ms. Shaffer held the follow-up meeting with Mr. Green, Ms. Nenni, and Plaintiff.[104] She emailed Plaintiff that same day, memorializing the meetings held in accordance with the Settlement Agreement.[105] Plaintiff felt that Ms. Shaffer had done what the agreement required her to do,[106] but that the meetings "kind of just made it worse":[107] "The meetings were like telling me everything that I did wrong and what I wasn't doing."[108] In one meeting, Ms. Shaffer told Plaintiff that "she needed to take some responsibility for what was going on at Nibley Park."[109] This was because there was "a complete communication breakdown" among the employees[110] and Ms. Shaffer believed "when that occurs it's . . . a shared responsibility to fix it."[111] At this meeting or the previous one, Plaintiff remembers Ms. Shaffer telling her to continue to report drug and alcohol use if she observed it.[112] Ms. Shaffer does not recall specifically telling her that, but acknowledged that it was part of onboarding training "that you should report illegal activity at . . . your place of employment."[113]

---

[101] *Id.* at 140:2–140:3, 140:9–140:11.
[102] *Id.* at 140:18–142:22.
[103] *Id.* at 139:22–142:22; Email from Harper to Vigil July 9, 2018, ECF No. 52-21 at 6.
[104] Email from Shaffer to Vigil July 13, 2018, ECF No. 52-16.
[105] *Id.*
[106] Vigil Dep. 109:18–109:20; 112:17–112:25.
[107] *Id.* at 108:5–108:8.
[108] *Id.* at 108:19–108:21.
[109] Shaffer Dep. 48:16–48:17.
[110] *Id.* at 50:9–50:10.
[111] *Id.* at 49:13–49:15.
[112] Vigil Dep. 37:17–37:23.
[113] Shaffer Dep. 71:3–71:9.

*July 17, 2018 Complaint*

On July 17, 2018, Plaintiff made a complaint against Derek Schmehl and Mr. Bowcut ("July 17, 2018 Complaint").[114] She alleged that Mr. Schmehl had breached confidentiality by inappropriately discussing Plaintiff's 2017 sexual harassment claim.[115] Ms. Harper, the investigator, found that Mr. Schmehl had been at a tournament talking to a former city employee who worked for the Utah Golf Association.[116] The day after the tournament, the former employee asked another individual "what is going on with [Plaintiff]" and indicated that they had "heard [Plaintiff] is real unstable" and "made a mess of things."[117] The former employee did not tell the other individual that they had received any information about Plaintiff from Mr. Schmehl.[118] The former employee told Ms. Harper that they had mentioned to Mr. Schmehl that "it is too bad about the harassment complaint," and Mr. Schmehl had told them that he did not want to talk about the complaint.[119] This allowed Ms. Harper to conclude that Plaintiff's allegation that Mr. Schmehl had breached confidentiality was false.[120]

Plaintiff also had complained that Mr. Bowcut had followed Plaintiff in the parking lot and, when she confronted him, lied about his reason for being in the parking lot (to retrieve golf clubs from his car), and that Mr. Bowcut had "singled out" Plaintiff by watching her ever since he made his allegation that she was drinking beer in her car.[121] Defendant investigated this as "offensive behavior related to sex."[122] Ms. Harper reviewed relevant video footage and found that it did not support Plaintiff's allegation; it showed Mr. Bowcut walking out to his vehicle,

---

[114] Investigative Report Sept. 18, 2018 at 1–2, ECF No. 52-22 at 3–4.
[115] *Id.*
[116] *Id.* at 1.
[117] *Id.* at 3.
[118] *Id.*
[119] *Id.*
[120] *Id.* at 4.
[121] Investigative Report Sept. 18, 2018 at 2.
[122] *Id.* at 1.

retrieving golf clubs, and walking back to the pro shop with golf clubs in hand.[123] Further, Ms. Harper determined Mr. Bowcut did not single out Plaintiff because he watched "everyone" from the pro shop.[124] Because of this evidence, Ms. Harper found that Plaintiff's allegations against Mr. Bowcut were false.[125] The report and conclusion were sent to Ms. Shaffer on September 18, 2018.[126]

*Plaintiff's Accusation of Mr. Borich's Drug Use*

On August 1, 2018, Plaintiff emailed Ms. Harper and told her, "I just witnessed Myles Borich in the cart barn smoking marijuana out of a pipe."[127] She also texted Mr. Elliot and said, "earlier this evening I walked into the cart barn and saw Myles smoking marijuana out of a pipe the cart attendant Soto said there's Monica and I smelled it and and [sic] saw the smoke that young boy Soto I believe is only 18."[128] Mr. Elliot responded that he would "visit with both of them."[129] The next morning, Ms. Harper forwarded Plaintiff's email to Mr. Kammeyer and Ms. Nenni.[130] Around 10:30 am, Mr. Kammeyer asked Ms. Nenni to help him coordinate the necessary paperwork to "send the two employees in for a drug test."[131]

On August 3, 2018, Ms. Nenni emailed Mr. Kammeyer back and told him that she had talked with others who agreed that sending only Mr. Borich in for a drug test "was best."[132] She indicated Mr. Elliot was going to call Mr. Borich that day to go for the drug test.[133] Mr. Borich

---

[123] *Id.* at 3.
[124] *Id.*
[125] *Id.* at 4.
[126] Letter from Harper to Shaffer on Sept. 18, 2018 at 1.
[127] Email from Vigil to Harper Aug. 1, 2018, ECF No. 52-24.
[128] Text from Vigil to Elliot, ECF No. 52-25.
[129] *Id.*
[130] Email from Harper to Kammeyer and Nenni Aug. 2, 2018, ECF No. 52-26.
[131] Email from Kammeyer to Nenni Aug. 2, 2018, ECF No. 52-26.
[132] Email from Nenni to Kammeyer Aug. 3, 2018, ECF No. 52-27.
[133] *Id.*

was tested the same day, and his result was negative.[134] On August 21, 2018, Plaintiff attended a meeting with Ms. Shaffer and Ms. Ninni.[135] They informed Plaintiff that her employment was terminated because of her false allegation about Mr. Borich's drug use[136]—the "allegation had created a disruption in the workplace and that was the basis for her termination."[137] The disruption was due to the investigation, which had required Human Resources ("H.R.") staff time and caused "the director of the golf division to pull the accused person out and have them sent for a reasonable suspicion drug test, . . . schedule disruptions" and "the person who was accused . . . to have a lot of stress and anxiety about why they were being pulled out of a workplace to have that reason."[138]

After she was terminated, Plaintiff applied to other golf courses.[139] Jeremy Green, who had given references for Plaintiff in the past,[140] informed her that H.R. told him that he could not give her a reference.[141] Plaintiff did not get another job in the industry, and she believed it was because Mr. Green would not give her a reference.[142] According to Plaintiff, because they were all "well known in the golf community," the other employers would consider the lack of Mr. Green's reference as a demerit.[143] Further, she believed they all learned about her sexual harassment complaint against Mr. Camacho.[144] She believed this because one employer called her and told her, "Monica, I cannot take the risk hiring you. It could ruin my business. [Mr.

---

[134] Specimen Result Certificate, ECF No. 52-28.
[135] Vigil Termination Notes, ECF No. 51-8.
[136] *Id.*
[137] Shaffer Dep. 5:19–5:23.
[138] *Id.* at 8:2–9:3.
[139] Vigil Termination Notes.
[140] Vigil Dep. 150:8–150:15.
[141] *Id.* at 98:15–99:5.
[142] *Id.* at 101:23–102:14.
[143] *Id.* at 102:6–102:14.
[144] *Id.* at 64:12–64:15, 102:9–102:12.

Camacho] comes here, and he teaches here."[145] However, she did not receive any rejection letters that specified that the reason she was not offered a position was because of Mr. Green not giving her a reference.[146] In fact, the only rejection letter discussed on the record encouraged her to apply for other openings with that golf course in the future.[147]

On May 7, 2020, Plaintiff filed a complaint against Defendant in state court.[148] Defendant removed the action to this court on June 1, 2020.[149] On March 17, 2023, both parties filed motions for summary judgment.[150] Plaintiff seeks summary judgment on her Title VII and Equal Protection Clause claims.[151] Defendant seeks summary judgment on those claims and Plaintiff's remaining breach of contract claim.[152] In her opposition, Plaintiff stipulated to the dismissal of her breach of contract claim.[153] The motions were fully briefed as of April 28, 2023.[154]

## STANDARD

"Summary judgment is appropriate if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"[155] "A disputed fact is 'material' if it might affect the outcome of the suit under the governing law, and the dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[156]

---

[145] *Id.* at 64:17–64:21.
[146] *Id.* at 104:6–104:10.
[147] *Id.* at 103:1–103:19.
[148] Compl., ECF No. 2-1.
[149] Notice of Removal, ECF No. 2.
[150] ECF Nos. 51–52.
[151] Pl.'s Partial Mot. Summ. J. 1, ECF No. 52.
[152] Def.'s Mot. Summ. J. 2, ECF No. 51.
[153] Pl.'s Opp'n 1 n.1, ECF No. 56.
[154] ECF Nos. 57–58.
[155] *Hamric v. Wilderness Expeditions, Inc.*, 6 F.4th 1108, 1121 (10th Cir. 2021) (quoting Fed. R. Civ. P. 56(a)).
[156] *Est. of Beauford v. Mesa Cnty., Colorado*, 35 F.4th 1248, 1261 (10th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

**DISCUSSION**

I.     **There Is a Genuine Issue of Material Fact Precluding Summary Judgment on Plaintiff's Title VII Claim.**

Title VII makes it unlawful for an employer to "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."[157] "Sexual harassment is discrimination because of sex."[158] "Title VII prohibits employers from retaliating against employees who engage in protected activity, i.e., opposing 'an unlawful employment practice' like discrimination because of sex."[159]

A.     *A Reasonable Fact Finder Could Determine that Defendant Terminated Plaintiff for Retaliatory Reasons under the McDonnell Douglas Framework.*[160]

"Where there is no direct evidence of retaliation, [courts] analyze a retaliation claim under the *McDonnell Douglas* burden-shifting framework."[161] Following this framework, if [the plaintiff] establishes a prima facie case of retaliation, the burden shifts to [the defendant] to assert a legitimate, nondiscriminatory reason for the adverse action. If [the defendant] provides a

---

[157] 42 U.S.C. § 2000e-2(a)(1).

[158] *Henrie v. Carbon Sch. Dist.*, 2023 WL 1948621, at *2 (10th Cir. 2023) (citing *Winsor v. Hinckley Dodge, Inc.*, 79 F.3d 996, 1000 (10th Cir. 1996)).

[159] *Id.* (citing 42 U.S.C. § 2000e-3(a)).

[160] In her Partial Motion for Summary Judgment, Plaintiff only advances her Title VII claim under a direct evidence theory, but in response to Defendant's Motion for Summary Judgment, she contends that "[e]ven under the *McDonnell Douglas* burden shifting framework, [Plaintiff can establish that [Defendant]'s supposedly 'non-discriminatory' reason for her termination was pretext." Pl.'s Opp'n 7. Because the analysis under either approach relies on the same evidence and has the same result on this record—that there is a genuine issue of material fact that precludes summary judgment for either side—the court does not devote further analysis to the direct evidence argument.

[161] *Stover v. Martinez*, 382 F.3d 1064, 1070 (10th Cir. 2004) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)).

legitimate, nondiscriminatory reason for its decision, the burden shifts back to [the plaintiff] to show that [the defendant]'s proffered reason is a 'pretext masking [retaliatory] animus.'"[162]

1. There Is Record Evidence to Support a Finding that Plaintiff Stated a Prima Facie Case of Title VII Retaliation.

"To state a prima facie case of Title VII retaliation, [the plaintiff] must plausibly allege '(1) that [s]he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action.'"[163]

For summary judgment purposes, there is no dispute that Plaintiff's complaints were "protected opposition to [alleged] discrimination."[164] And while Defendant concedes that the termination of Plaintiff's employment was materially adverse,[165] Defendant argues that there was no causal connection between the protected activity and Plaintiff's termination.[166] Plaintiff responds that "the temporal proximity between her July 17, 2018 Complaint and her August 21, 2018 termination is sufficiently close to establish the causation element."[167]

---

[162] *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1208 (10th Cir. 2007) (quoting *Piercy v. Maketa*, 480 F.3d 1192, 1198 (10th Cir. 2007)).

[163] *Reznik v. inContact, Inc.*, 18 F.4th 1257, 1260 (10th Cir. 2021) (citing *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012)).

[164] Defendant makes the argument that Plaintiff's complaints in 2018 were not protected activity for the first time in its Reply. "But arguments raised for the first time in a reply brief are waived." *In re: Motor Fuel Temperature Sales Pracs. Litig.*, 872 F.3d 1094, 1113 n.5 (10th Cir. 2017) (citing *Reedy v. Werholtz*, 660 F.3d 1270, 1274 (10th Cir. 2011) ("[T]he general rule in this circuit is that a party waives issues and arguments raised for the first time in a reply brief.")). Defendant's assertion that Plaintiff "now claims that while her various unsubstantiated complaints may not have been adverse employment actions, they were protected activity" does not justify its failure to contest the issue in its Opposition to Plaintiff's Partial Motion for Summary Judgment, in which Plaintiff argues that she "engaged in protected activity several times over the summer of 2018 and the City terminated her." Pl.'s Partial Mot. Summ. J. 24; *see also id.* at 11 ("Between October 18, 2017, and her termination, [Plaintiff] made six complaints of discrimination or retaliation."). Further, there is record evidence that Defendant treated these complaints as complaints based on protected class. *See* Kammeyer Dep. 21:24–22:13.

[165] Def.'s Mot. Summ. J. 24.

[166] *Id.* at 24–25.

[167] Pl.'s Opp'n 8.

"To establish that a causal connection exists . . . , [the plaintiff] may proffer 'evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.'"[168] The Tenth Circuit has found that a time span of one and a half months between protected activity and an adverse employment action may be sufficient to show a causal connection.[169] Here, just over a month passed between the time of Plaintiff's last protected activity (her July 17, 2018 Complaint) and her termination. Accordingly, because there is evidence from which a reasonable fact finder could conclude that there was a causal connection between Plaintiff's protected activity and the adverse action, Plaintiff has stated a prima facie case.

### 2. *Defendants Met Their Burden to Offer a Nonretaliatory Reason for Plaintiff's Termination.*

If the plaintiff can establish a prima facie case, this "shifts the burden to the employer to produce a legitimate, non[retaliatory] justification for taking the disputed employment action."[170] Here, Defendant asserts that the reason for Plaintiff's termination was her false accusation that a coworker was possessing and using an illegal drug on the job.[171] Her accusation violated Defendant's policy because it was "so obviously disruptive to the workplace."[172] This is more than sufficient to meet Defendant's burden.

---

[168] *Proctor*, 502 F.3d at 1208 (quoting *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1228 (10th Cir. 2006)).
[169] *Ramirez v. Okla. Dep't Mental Health*, 41 F.3d 584, 596 (10th Cir. 1994) *overruled on other grounds by Ellis v. Univ. of Kan. Med. Ctr.*, 163 F.3d 1186, 1194-97 (10th Cir. 1998); *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 804 (10th Cir. 2007) ("Here, the challenged actions were within a month of Ms. Segovia's last instance of protected activity. We have previously held that such temporal proximity, alone, is sufficient to allow an inference of the existence of a causal connection between the two events." (citing *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006)).
[170] *Stover v. Martinez*, 382 F.3d 1064, 1071 (10th Cir. 2004) (citing *Jones v. Barnhart*, 349 F.3d 1260, 1266 (10th Cir. 2003)).
[171] Def.'s Mot. Summ. J. 25.
[172] *Id.* at 26.

3. *A Reasonable Fact Finder Could Determine that Defendant's Proffered Reason for Plaintiff's Termination Was Pretextual.*

"If the employer provides a legitimate, non-[retaliatory] justification for the action, the burden shifts back to the employee to provide evidence showing that the employer's proffered reason is a pretext for [retaliation]."[173] "A plaintiff can meet this burden to show pretext in either of two ways: (1) by showing that the proffered reason is factually false or (2) by showing that [retaliation] was a primary factor in the employer's decision, which is often accomplished by revealing 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reason[ ],' such that a reasonable fact finder could deem the employer's reason 'unworthy of credence.'"[174] "If there is reason to believe the employer's reasons are pretextual, the case may be submitted to the jury."[175]

A decisionmaker's comments that reveal retaliatory views may be evidence of pretext.[176] Here, Plaintiff offers evidence that Ms. Shaffer, the person who made the decision to terminate Plaintiff, gave the following testimony at her deposition:

> Q. And the first question I have is, what was the basis for [Plaintiff]'s termination?
>
> A. As -- as I recall, [Plaintiff] made an allegation that she reported to HR that a coworker at the course that she was working at at the time was smoking marijuana from a pipe. We subsequently had that employee tested -- drug tested, and the drug test came back clean for all substances. So making that kind of very egregious and false allegation is a thing that we take very seriously and the determination was made that that allegation created a disruption in the workplace and that was the basis for her termination.
>
> Q. And was that the only reason that she was terminated?

---

[173] *Stover*, 382 F.3d at 1071 (citing *Jones*, 349 F.3d at 1266).
[174] *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1218 (10th Cir. 2013) (quoting *Garrett v. Hewlett–Packard Co.*, 305 F.3d 1210, 1217 (10th Cir. 2002)).
[175] *McGowan v. City of Eufala*, 472 F.3d 736, 741 (10th Cir. 2006).
[176] *See Tabor*, 703 F.3d at 1218.

A. It was -- it was the basis for her termination. That was the -- the final reason that she was terminated.

Q. Well, were there other reasons as well or was it just this one incident?

A. It was -- it was -- the one incident would have been enough for me to make that determination to terminate her but there were other circumstances that led to her termination. It was a culmination of issues that led to her termination.

Q. What were the other issues that played a part in this?

A. There were several allegations that she had made to HR in -- which I think -- and David can help me understand this -- but I think HR or another employee is going to be answering specifically on those questions. But there were other allegations that she made that were also not able to be substantiated in the months and years -- I think months, leading up to her ultimate termination. Excuse me.

Q. And so those allegations played a part in your decision to terminate her?

A. I would say that they – yeah. They -- they – they helped to make it -- yes. She had created a disruption in the workplace leading up to this point, but the false allegation -- the provably false allegation was the deciding factor for me.[177]

[. . .]

Q. In deciding to terminate her, did you consider some of these other allegations that she'd been making -- that were unsubstantiated as well?

A. You know, I think -- I think it would be fair to say that the amount of time that I had been made aware of [Plaintiff's] allegations and the amount of effort that I'd personally put in to trying to make her work experience a positive one and the amount of work that HR had done investigating all – all of the allegations that came back unsubstantiated -- you know, the history, I think it's fair to say that history -- I would be less than human if that wasn't part of my thought process. You know, I had spent an extraordinarily disproportionate amount of time with this part-time employee in a very large department. I -- yeah, it's -- there was a lot of time and

---

[177] Shaffer Dep. 5:12–6:23.

energy put into one employee's success. I can't -- I don't have the luxury of spending that much time with every employee.

Q. So her -- her complaints to HR were consuming a lot of your time as director; is that right?

A. No -- the time that I spent with [Plaintiff] in terms of the meetings that I facilitated [pursuant to the Settlement Agreement], the mediation that I'd gone through with [the City's Attorney], the follow-up meetings, the meeting that we had after the drug test, the emails saying the accusation, like, all -- you know, reading of the report, all of the time in which I had spent with her, yeah, it was a lot. Disproportionate, I would say. Like, wildly disproportionate.[178]

As noted, it is undisputed for purposes of summary judgment that Plaintiff's "several allegations that she had made to HR" were protected activity.[179] In other words, a reasonable jury could find Ms. Shaffer's testimony is that Plaintiff's protected activity played a part in her decision to terminate Plaintiff, though it was not the "deciding factor," and Ms. Shaffer would have fired any part-time employee on the basis of a verifiably false accusation of drug use alone. Plaintiff also points to evidence that Ms. Shaffer told her to "take responsibility" for the situation at Nibley,[180] "demonstrating an animus toward [Plaintiff's] protected activity."[181] Ms. Shaffer made this comment to Plaintiff during one of the meetings held pursuant to the Settlement Agreement.[182] Ms. Shaffer told Plaintiff this because Ms. Shaffer believed "there's never just one party that's responsible for the problem,"[183] the problem being the "communication issue" caused in part by Plaintiff's protected activity.[184]

---

[178] *Id.* at 69:9–70:9.
[179] Defendant also argues that Plaintiff's prior reports of alleged retaliation that preceded the parties' June 4, 2018 settlement have been compromised and should not be considered. Because Plaintiff concedes that the earlier events of which she complained did not result in any adverse action, Pl.'s Opp'n 5, the court does not consider Defendant's argument further here.
[180] Shaffer Dep. 48:16–48:18.
[181] Pl.'s Opp'n 9.
[182] Shaffer Dep. 47:21–48:17.
[183] *Id.* at 48:16–48:24.
[184] *Id.* at 49:4–49:15.

In addition to Ms. Shaffer's testimony, Plaintiff points to Mr. Kammeyer's deposition. Mr. Kammeyer stated that he was a "part of the discussions" surrounding Plaintiff's termination, but he did not make the decision to terminate her.[185] Ms. Shaffer corroborates this; when asked for the date she decided to terminate Plaintiff, she responded that she remembered having a conversation with "HR, with Matt [Kammeyer], and with [the City Attorney] about — about what to do and the seriousness of the — of [Plaintiff's] accusation."[186] This meeting occurred on the afternoon of August 14, 2018.[187] After participating in the August 14 meeting, Mr. Kammeyer understood that the reason for Plaintiff's termination was that,

> there were a number of complaints that had been brought up by [Plaintiff] against coworkers, and it had been -- had been proving to be somewhat of a difficult distraction after these. And each -- each incident was researched by our HR staff and also outside staff, in one instance was assigned to an outside entity. But each of these incidents had proved that there was insufficient evidence for the city to take any action. And so the decision to dismiss her was – was the result of kind of an aggregate of all of these complaints with the disruption that had been caused at the golf course.[188]

Plaintiff received a call from Ms. Shaffer's secretary on August 16 (the last day of the Junior Golf program), requesting a meeting on August 17.[189] The meeting was ultimately scheduled for August 21, and at that meeting Ms. Shaffer terminated Plaintiff's employment.[190]

Defendants argue that Mr. Kammeyer's statements on this topic are inadmissible because the question was outside of the scope of Mr. Kammeyer's Rule 30(b)(6) designation.[191] But

---

[185] Kammeyer Dep. 17:4–17:6.

[186] Shaffer Dep. 58:24–59:3.

[187] Id. at 64:1–64:8; Calendar Invite Titled "M. Vigil," ECF No. 52-30.

[188] Kammeyer Dep. 17:9–17:21.

[189] Vigil Termination Notes. Plaintiff informed Ms. Shaffer's secretary that she was unavailable on the 17th, and the meeting was scheduled for August 21, 2018. Id.

[190] Id.

[191] Def.'s Opp'n 25; Def.'s Reply 11, ECF No. 57. Plaintiff contends that "[Defendant's] Opposition states that his testimony is 'inadmissible' but makes no argument as to why." Pl.'s Reply 17 n.1, ECF No. 58. The court observes that Defendant does make an argument as to why—it was outside the scope of his 30(b)(6) designation—but

while his testimony on this issue is not an evidentiary admission of Defendant,[192] it is evidence

from an individual fact witness.[193] This evidence indicates that a person involved in discussions

about Plaintiff's termination with the decisionmaker believed that she was being terminated in

part for her protected activity.

Plaintiff also points to evidence that she was terminated for making a false accusation

against a coworker for using an illegal substance on company property[194] when another

employee (Mr. Bowcut) was not disciplined after he accused a coworker (Plaintiff) of drinking

alcohol while on company property and during her shift.[195] "[A] plaintiff may [ ] show pretext

. . . by providing evidence that [s]he was treated differently from other similarly-situated, [ ]

employees who violated work rules of comparable seriousness."[196] While Defendant argues that

the accusations were "categorically different,"[197] a reasonable jury could consider this

evidence—that Plaintiff was fired for her false accusation of a coworker's drug use but another

employee was not disciplined for an "unsubstantiated" allegation of a coworker's alcohol

consumption—and find that it reveals an "inconsistency" or "contradiction" in Defendant's

proffered reason.[198]

Plaintiff also argues that she was not terminated for violating a specific policy against

false drug use accusations, but rather for causing a disruption to the workplace due to the ensuing

investigation.[199] "A plaintiff may [ ] show pretext by demonstrating 'the defendant acted

---

acknowledges that Defendants do not cite to any case law to support their argument. Because Defendants have not
shown that the evidence is inadmissible, the court considers it.
[192] *See Vehicle Mkt. Rsch., Inc. v. Mitchell Int'l, Inc.*, 839 F.3d 1251, 1261 (10th Cir. 2016).
[193] *See* Pl.'s Reply 16–17.
[194] Shaffer Dep. 5:15–5:23, 47:5–47:15.
[195] Def.'s Opp'n 13 ("Undisputed that Bowcut was never disciplined . . . .").
[196] *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1232 (10th Cir. 2000).
[197] Def.'s Opp'n 17.
[198] *See infra* Section II for additional discussion on the evidence allowing for this inference.
[199] Shaffer Dep. 7:19–8:11; Standards of Conduct 1, ECF No. 52-33 ("General expectations for all city employees:
. . . Employees will conduct themselves in a manner that will not disrupt the workplace.").

contrary to a written company policy,' an unwritten company policy, or a company practice 'when making the adverse employment decision affecting the plaintiff.'"[200] Defendant argues that her false accusation violated four distinct sections of Defendant's Human Resources Policy ("Policy"), the first three being:

> General expectations for all city employees:
>
> Employees will dedicate themselves to the highest ideals of professionalism, honor, and integrity in order to merit the trust, respect, and confidence of the public they serve.
> . . .
> Employees will conduct themselves in a manner that will not disrupt the workplace, undermine the authority of management, impair close working relationships, offend the public or otherwise impede the effective operation of city government.
>
> All city employees will demonstrate the highest level of courteous and respectful behavior in all dealings with coworkers, supervisors, direct reports and the public.[201]

Yet because the Policy does not mandate discipline for violations, let alone termination—"Violations of this policy may subject the employee to non-disciplinary or disciplinary intervention"—a jury could consider this evidence that, in contrast to Ms. Shaffer's assertion that she would fire any part-time golf employee for making a false allegation of drug use,[202] Defendant does not have a consistent policy of terminating employees who make such accusations. Further, concerning the last section of identified policy—"[i]nappropriate behavior includes but is not limited to the following: . . . Filing a malicious, fraudulent, or frivolous complaint with the intent to cause harm, disrupt city services, or with reckless disregard or intent to harass"[203]—there is record evidence that Ms. Shaffer did not consider Plaintiff's intent

---

[200] *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017) (quoting *Kendrick*, 220 F.3d at 1230).
[201] Def.'s Opp'n 12-13 (quoting Standards of Conduct 1).
[202] Shaffer Dep. 73:10–73:17.
[203] Def.'s Opp'n 12; Standards of Conduct 1.

relevant,[204] suggesting this section of policy may not be applicable. At most, this evidence suggests that Ms. Shaffer was not mandated to act in the way she did by policy, which could be considered inconsistent with her assertion that she would terminate any employee who made such an accusation. This is slight evidence of pretext, but certainly by itself would not be sufficient evidence to withstand summary judgment.

Taken together, Ms. Shaffer and Mr. Kammeyer's statements, the evidence of how Defendant handled Mr. Bowcut's accusation and Plaintiff's accusation, and the arguable incongruence between Ms. Shaffer's position and Defendant's policy on false accusations of substance use are evidence from which a reasonable jury could find that Defendant's nondiscriminatory reason for Plaintiff's termination was pretextual. Of course, a reasonable jury could consider the same evidence and find that Plaintiff's termination was not pretextual. For example, the jury could find that Ms. Shaffer would have terminated or did terminate Plaintiff's employment solely based on Plaintiff's false accusation, that Plaintiff's conduct in falsely accusing a coworker of drug use was not comparable to accusing a coworker of alcohol consumption on the job, and that there is no inconsistency between Ms. Shaffer's position on categorical termination for false accusations of drug use and company policy.

Summary judgment for either side is precluded.

---

[204] Shaffer 61:20–62:2 ("I -- I would say that her intention wasn't part of the discussion. The allegation was made and it was provably false, that was the determination."). Still, Ms. Shaffer stated that she assumed that a person would only make "that kind of an allegation" if they are "certain." *Id.* at 65:3–65:6. "[T]here's no distinction" between a mistakenly false allegation and a deliberately false accusation because "when [a person is] making that kind of allegation, there's an assumption that [that person] is certain, right, that [the person is] taking it as seriously as it should be taken." *Id.* at 64:21–65:7.

## II.     There Is a Genuine Issue of Material Fact Precluding Summary Judgment on Plaintiff's Equal Protection Claim.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike."[205] "If the City officials are final policymakers in the area of personnel policy (i.e. are authorized to make final employment decisions as to wages, promotions, hiring and termination), the City can be held liable for any impermissible employment decisions under §§ 1981 and 1983 pursuant to the *McDonnell Douglas* framework originally developed to determine the existence of intentional discrimination in violation of Title VII."[206]

"[A] prima facie case of discrimination must consist of evidence that (1) the victim belongs to a protected class; (2) the victim suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of

---

[205] *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).
[206] *Randle v. City of Aurora*, 69 F.3d 441, 450 (10th Cir. 1995); *see Morman v. Campbell Cnty. Mem'l Hosp.*, 632 F. App'x 927, 934 (10th Cir. 2015) (quoting *Ney v. City of Hoisington*, 264 Fed. App'x 678, 684 (10th Cir. 2008)); *Salguero v. City of Clovis*, 366 F.3d 1168, 1175 (10th Cir. 2004) (citing *Randle*, 69 F.3d at 450); *Drake v. City of Fort Collins*, 927 F.2d 1156, 1162 (10th Cir. 1991)).

> Municipality liability is limited to actions "for which the municipality is actually responsible." To prove municipal liability under § 1983, the plaintiff must show: (1) a municipality enacted or maintained a policy, (2) the municipality was deliberately indifferent to the resulting constitutional violations, and (3) the policy caused the underlying constitutional violation. A court may find that the challenged practice is an official policy or custom for municipal liability purposes if "it is a formally promulgated policy, a well-settled custom or practice, a final decision by a municipal policymaker, or a deliberately indifferent training or supervision."

*Arnold v. City of Olathe, Kan.*, 35 F.4th 778, 795 (10th Cir. 2022) (quoting *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769–70 (10th Cir. 2013)). Defendant contends that "[Plaintiff] cannot meet this standard, because she cannot show" any of the elements. Def.'s Mot. Summ. J. 27. However, Defendant did not dispute that Ms. Shaffer made the final decision to terminate Plaintiff. *See* Def.'s Reply 11 ("Lisa Shaffer made the decision to fire [Plaintiff], and Ms. Shaffer had final policy making authority over that decision." (quoting Pl.'s Partial Mot. Summ. J. 17)). Because this element is undisputed, the following two elements are analyzed within the *McDonnell Douglas* framework.

discrimination."[207] The "critical prima facie inquiry"—that "the adverse employment action

occurred 'under circumstances which give rise to an inference of unlawful discrimination'"[208]—

can be shown with evidence of "disparate treatment among similarly situated employees."[209] "At

this stage, the burden is 'slight.'"[210]

"If a plaintiff states a prima facie case, the burden shifts to the employer to proffer 'a

legitimate non-discriminatory purpose for the adverse employment action.'"[211] "If the employer

makes this offering, the plaintiff will avoid summary judgment only if she shows her sex 'was a

determinative factor in the . . . employment decision, or show[s] the [employer's] explanation for

its action was merely pretext.'"[212] "Pretext can be shown by such weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons

for its action that a reasonable factfinder could rationally find them unworthy of credence and

hence infer that the employer did not act for the asserted non-discriminatory reasons."[213] "The

relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but

whether it honestly believed those reasons and acted in good faith upon those beliefs."[214]

While the Equal Protection analysis parallels the Title VII analysis, Plaintiff's Equal

Protection claim is cognizable only based on her purportedly disparate treatment *as a woman*. An

Equal Protection claim is not cognizable on evidence of retaliation due to her report of sexual

---

[207] *PVNF, L.L.C.*, 487 F.3d at 800 ("In this context, a prima facie case of discrimination must consist of evidence that (1) the victim belongs to a protected class; (2) the victim suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination." (citing *Sorbo v. United Parcel Serv.*, 432 F.3d 1169, 1173 (10th Cir.2005))); *see Tabor*, 703 F.3d at 1216.

[208] *Plotke v. White*, 405 F.3d 1092, 1100 (10th Cir. 2005) (quoting *Kendrick*, 220 F.3d at 1227).

[209] *OneSource Com. Prop. Servs., Inc. v. City & Cnty. of Denver*, 535 F. App'x 740, 748 (10th Cir. 2013).

[210] *Hamilton v. Okla. City Univ.*, 563 F. App'x 597, 601 (10th Cir. 2014) (quoting *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005)).

[211] *Tabor*, 703 F.3d at 1216–17 (quoting *Orr*, 417 F.3d at 1149).

[212] *Id.* at 1217 (alterations in original).

[213] *Lobato v. New Mexico Env't Dep't*, 733 F.3d 1283, 1289 (10th Cir. 2013) (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).

[214] *Luster v. Vilsack*, 667 F.3d 1089, 1094 (10th Cir. 2011) (quoting *Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 924–25 (10th Cir. 2004)).

harassment because "this court does not recognize . . . a retaliation claim under § 1983 asserting a denial of equal protection."[215] To the extent Plaintiff alleges a denial of equal protection based on her complaints,[216] that theory of liability is precluded.

The parties do not dispute that Plaintiff belongs to a protected class as a woman, that she suffered an adverse employment decision in being terminated, or that Defendant has articulated a legitimate, nondiscriminatory reason for the adverse employment decision—Plaintiff's false allegation of a coworker's drug use. Both sides contest whether the evidence shows that Plaintiff was treated differently than a similarly situated male employee, but it is unclear whether they argue that such evidence shows or does not show "an inference of unlawful discrimination" under Plaintiff's prima facie case or a presence or absence of pretext at the third step of the *McDonnell Douglas* framework.[217] Accordingly, the issue is whether the evidence shows disparate treatment among similarly situated employees sufficient to satisfy both Plaintiff's prima facie case and a showing of pretext.

"Individuals are considered 'similarly-situated' when they deal with the same supervisor, are subjected to the same standards governing performance evaluation and discipline, and have engaged in conduct of 'comparable seriousness.'"[218] "In determining whether two employees are similarly situated, a 'court should also compare the relevant employment circumstances, such as

---

[215] *Allstate Sweeping, LLC v. Black*, 706 F.3d 1261, 1266 (10th Cir. 2013) (citing *Maldonado v. City of Altus*, 433 F.3d 1294, 1308 (10th Cir. 2006)); *see also Long v. Laramie Cnty. Cmty. Coll. Dist.*, 840 F.2d 743, 752 (10th Cir. 1988).

[216] Compl. ¶ 44.

[217] Def.'s Mot. Summ. J. 27–29 (discussing the "critical distinctions" between Plaintiff's accusation and Mr. Bowcut's accusation and contending that "[Plaintiff] cannot prove a prima facie case of discrimination. . . . [Plaintiff] cannot rebut this legitimate decision with any evidence of pretext."); Pl.'s Partial Mot. Summ. J. 19–23 (arguing that Plaintiff has satisfied the prima facie case because Plaintiff and Mr. Bowcut were similarly situated employees who committed policy violations of comparable seriousness but Mr. Bowcut was treated more favorably than Plaintiff and then, without more (i.e. the second and third steps of the *McDonnell Douglas* framework), claiming that "[Plaintiff] is entitled to judgment in her favor on the Equal Protection claim"); Pl.'s Opp'n 12–14 (arguing that the evidence of the comparable seriousness of Plaintiff's and Mr. Bowcut's policy violations demonstrates pretext under the third step of the *McDonnell Douglas* analysis).

[218] *PVNF, L.L.C.*, 487 F.3d at 801 (quoting *McGowan*, 472 F.3d at 745).

work history and company policies, applicable to the plaintiff and the intended comparable employees.'"[219] "Determining the similarity of the situations is generally a fact question."[220]

It is undisputed that Mr. Bowcut was a "similarly-situated" employee—in terms of supervisor, standards governing performance evaluation and discipline, and work history—to Plaintiff in 2018.[221] The dispute is whether Mr. Bowcut and Plaintiff committed conduct of "comparable seriousness."

Turning to the record, there is evidence that on June 21, 2018 at 2:08 pm, Mr. Bowcut emailed Ms. Nenni, stating,

> Liz,
>
> I have something happen here and I'm not sure how to handle it. I saw [Plaintiff] drinking a beer in her can [sic] while she was teaching the Jr golf Class. What should I do?
>
> Zach Bowcut[222]

At 2:19 pm, Ms. Nenni emailed Mr. Bowcut back. She asked, "Does she smell like alcohol or look like she's under the influence? Red eyes, slurred speech, etc?"[223] Mr. Bowcut emailed back three minutes later, "I was in my car parked next [sic] her, taking my 30 minute break and was her [sic] drinking a beer."[224] A minute later, Ms. Nenni replied, "How long ago was this?"[225] Mr. Bowcut emailed her back within two minutes, asking, "Do I ask her about it?"[226] Ms. Nenni

---

[219] *McGowan*, 472 F.3d at 745 (quoting *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997)).
[220] *Ibrahim v. All. for Sustainable Energy, LLC*, 994 F.3d 1193, 1197 (10th Cir. 2021) (citing *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1117 (10th Cir. 2007)).
[221] Defendant does not argue that Mr. Bowcut and Plaintiff had different work histories.
[222] Email from Bowcut to Nenni June 21, 2018, ECF No. 52-17 at 2.
[223] Email from Nenni to Bowcut June 21, 2018, ECF No. 52-17 at 1.
[224] Email from Bowcut to Nenni June 21, 2018, ECF No. 52-17 at 1.
[225] Email from Nenni to Bowcut June 21, 2018, ECF No. 52-17 at 1.
[226] Email from Bowcut to Nenni June 21, 2018, ECF No. 52-17 at 1.

responded two minutes later, "Will you give me a call?"[227] Defendant did not request that

Plaintiff submit to a chemical test, nor did Defendant remove her from duty.[228]

      The next day, a Friday, Mr. Bowcut replied to the email chain, stating "I have asked

[Plaintiff] that I saw her drinking a beer, she told me it was pepto not a beer. I'm sure you will be

hearing from her."[229] Three days later, on Monday, Ms. Shaffer emailed Mr. Bowcut, stating,

> Liz informed me that you reported observing [Plaintiff] drinking a
> beer in her car while she was "on the clock". She also reports that
> you confronted [Plaintiff] about the incident and she denied it. As
> you are aware, this is a very serious allegation. Would you be willing
> to write down everything you remember and submit it to Liz in
> HR?[230]

Mr. Bowcut responded, "Here is what I remember about the Incident. If you need anything else

I'm here."[231] He wrote that,

> I was taking my 30 minute break at 1:30pm in my car, I park under
> a tree in the main parking lot for the shade. That day [Plaintiff] had
> parked next to my car, I had my seat laid back at about 1:50pm I saw
> [Plaintiff] drive her cart up to her car open the door and climb into
> her car. As I looked over I see her reach down and start drinking out
> of a Bud Light a can, after she was done she got back into the cart
> and drove away. After that I called Steve right away to tell him what
> I saw, after that I tried call Matt [Kammeyer] and left a voice
> message, then I sent an email to Liz telling her what I had seen. The
> next day 6-22-18 I opened the golf course at 10:30 [Plaintiff] came
> in for a private lesson who had been waiting and ended up leaving
> she came back into the golf shop and I a calm voice told her that I
> had seen her drinking a Bud Light in her car during the Jr Golf
> Camp, she quickly got defensive and said it was pepto not a beer, I
> said "[Plaintiff], I know what a bud light looks like" she continued
> to denied it and say I was trying to get rid of her, I said "No, I'm
> trying to run the Jr golf program and make sure the children are safe
> and I have notified Steve and Liz about what I saw" after that she
> left and I have not spoken to her since.[232]

---

[227] Email from Nenni to Bowcut June 21, 2018, ECF No. 52-17 at 1.
[228] Vigil Dep. 51:7–51:19; Shaffer Dep. 45:12–45:17; Kammeyer Dep. 19:5–19:9.
[229] Email from Bowcut to Nenni June 22, 2018, ECF No. 52-17 at 2.
[230] Email from Shaffer to Bowcut June 25, 2018, ECF No. 52-17 at 4.
[231] Email from Bowcut to Shaffer June 26, 2018, ECF No. 52-17 at 5.
[232] *Id.* at 6.

In her deposition, Plaintiff stated that Mr. Bowcut's allegation was false.[233] Ms. Shaffer believed the outcome of Mr. Bowcut's allegation was that it was "unsubstantiated."[234]

At 8:02 pm on August 1, 2018, Plaintiff emailed Ms. Harper.[235] She stated that,

> Darlene,
>
> I just witnessed Myles Borich in the cart barn smoking marijuana out of a pipe the cart attendant Soto said there's Monica and I smelled it and and saw the smoke that young boy Soto I believe is only 18.
>
> Approximately 6:30 PM[236]

She also texted Mr. Elliot, saying, "Steve, earlier this evening I walked into the cart barn and saw Myles smoking marijuana out of a pipe the cart attendant Soto said there's Monica and I smelled it and [sic] saw the smoke that young boy Soto I believe is only 18."[237] Mr. Elliot responded, "I will visit with both of them."[238] The next morning, Ms. Harper emailed Plaintiff back, saying she would forward the email on to the correct recipients.[239] She forwarded the email to Ms. Nenni and Mr. Kammeyer.[240] Mr. Kammeyer—one of the individuals Mr. Bowcut had called immediately after allegedly seeing Plaintiff drinking on the job—responded, "I would like to send the two employees in for a drug test. Can you call me and help me coordinate the necessary paperwork. Thanks."[241] Mr. Borich was sent to Concentra for a drug test on August 3, 2018.[242] It

---

[233] Vigil Dep. 69:18–69:25.
[234] Shaffer Dep. 47:8.
[235] Email from Vigil to Harper Aug. 1, 2018, ECF No. 52-24.
[236] *Id.* at 3.
[237] Text from Vigil to Elliot.
[238] *Id.*
[239] Email from Harper to Vigil Aug. 2, 2018, ECF No. 52-24.
[240] Email from Harper to Kammeyer and Nenni, Aug. 2, 2018, ECF No. 52-26.
[241] Email from Kammeyer to Nenni Aug. 2, 2018, ECF No. 52-26.
[242] Email from Nenni to Kammeyer Aug. 3, 2018, ECF No. 52-27.

came back negative.[243] Ms. Shaffer terminated Plaintiff on August 21, 2018,[244] the "basis" and "deciding factor" being her false allegation against Mr. Borich.[245]

Ms. Shaffer stated that Plaintiff was terminated while Mr. Bowcut was not because his allegation was found to be unsubstantiated and did not involve an illegal substance,[246] while Plaintiff's allegation was "provably false"[247] and concerned an illegal substance.[248] Ms. Shaffer stated that Plaintiff's "intention" in making her allegation about Mr. Borich "wasn't part of the discussion. The allegation was made and it was provably false, that was the determination."[249] Even if Plaintiff had simply been mistaken about what she saw, Ms. Shaffer still would have terminated her.[250] This is because, to Ms. Shaffer, "there's no distinction" between a mistakenly false allegation and a deliberately false accusation; "when [a person is] making that kind of allegation, there's an assumption that [person is] certain, right, that [the person is] taking it as seriously as it should be taken."[251] Ms. Shaffer stated that she would have fired any part-time golf employee who had made such an accusation.[252] On the other hand, there is also evidence that Plaintiff had reported coworkers drug use previously,[253] and that when Plaintiff asked if she should not report it after having made several accusations, Ms. Shaffer told her to continue reporting it.[254]

---

[243] Specimen Result Certificate.
[244] Def.'s Supp. Resp. to Pl.'s Interrog. & Reqs. Produc. Docs. to Def. 6, ECF No. 52-32 at 5.
[245] Shaffer Dep. 5:15–5:25, 6:17–6:23.
[246] *Id.* at 62:22–63:2.
[247] *Id.* at 64:11, 65:18–65:24.
[248] *Id.* at 7:20.
[249] *Id.* at 61:25–62:2; *see id.* 64:24–65:7.
[250] *Id.* at 62:19–62:21.
[251] *Id.* at 64:21–65:7.
[252] *Id.* at 73:10–73:17.
[253] Investigative Report May 29, 2018 at 2.
[254] Vigil Dep. 37:17–37:23 ("Q. Okay. Any other reasons why you would say Lisa Shaffer mistreated you or treated you unfairly? A. Well, she fired me for making an allegation when, indeed, in the meetings I asked her about the drug and alcohol abuse, and I said, Should I just stop reporting it? No, no no, continue to report it if you see it."); *id.* at 71:19–71:20 ("Lisa Shaffer told me to continue to report any drugs and alcohol."); *id.* at 96:5–96:11 ("For Lisa to

Under the Defendant's Human Resources Policy concerning "Alcohol and Drugs," Defendant prohibits the "possession, . . . consumption, or use of drugs . . . on city premises (including city vehicles) or on work time" and prohibits "employees on duty from being under the influence of alcohol to the extent it may impact job performance or make them unfit for duty because of such use."[255] If, after a chemical test, an employee tests positive for a controlled substance or alcohol, the Policy provides that Defendant may "[s]ubject the person to disciplinary action, which may include termination of employment" and "[t]ake other non-disciplinary measures."[256] The Policy outlines the chemical testing procedure.[257] It states that a supervisor should first "observe[] and document[] behaviors that suggest an employee may be under the influence of a chemical substance."[258] "If another supervisor is available, [the supervisor should] ask[] him/her to observe [the] employee's appearance and behavior."[259] "If [the] employee appears impaired, [the supervisor should] advise[] [the] employee that he/she will be taken for screening under the reasonable suspicion provisions of the city's drug and alcohol policy."[260] However, "[u]nder city policy, alcohol possession goes beyond reasonable suspicion and the supervisor is required to immediately remove the employee from duty."[261] While the Drug and Alcohol Screening Procedure applies to most situations in which a supervisor has a reasonable suspicion that the employee is under the influence, "[t]he supervisor is not required to

---

tell me to keep bringing forward any drug or alcohol complaints, so I did, and I got terminated. Q. Okay. A. If she would have told me not to bring it up or say anything anymore, I wouldn't have said anything anymore.").
[255] Human Resources Policy: Alcohol and Drugs 1, ECF No. 52-33.
[256] *Id.* at 3.
[257] Human Resources Policy: Drug and Alcohol Screening Procedure 2, ECF No. 52-33.
[258] *Id.*
[259] *Id.*
[260] *Id.*
[261] *Id.*

perform an alcohol test when an employee is caught with alcohol in his/her possession."[262] If a drug or alcohol test is positive, discipline or termination "may occur on the first offense."[263]

Under Defendant's Policy, "[c]ommitting any action that may constitute a crime or violation of applicable law, either on-duty or off-duty, where such action adversely reflects on the employee's ability to perform assigned duties" is considered "inappropriate behavior," but Defendant's Policy does not assign it a specific disciplinary protocol. Committing a crime does not necessarily result in a different outcome for an employee than any other "inappropriate behavior" under the Policy. In other words, Defendant's Policy does not treat drug and alcohol use differently, even when such use also constitutes a criminal act.

Plaintiff is the only employee "in the Public Services Department who [was] terminated solely on the basis of 'falsely accusing a co-worker of misconduct' and/or 'conduct that was disruptive and detrimental to the work environment.'"[264] Since 2013, these two incidents involving Plaintiff and Mr. Bowcut were the only times in which an employee had reported a coworker's drug or alcohol use.[265]

This is evidence from which a reasonable fact finder could, though it need not, find that Plaintiff and Mr. Bowcut engaged in conduct of comparable seriousness. Both Plaintiff and Mr. Bowcut made an allegation about another employee using drugs or alcohol while clocked in and on company property. Both directly reported the allegation to their supervisor(s) and H.R. The parties have not identified any record evidence that either employee believed their allegation to be false, and, in any event, their intent was not considered by the decisionmaker. Under Defendant's Policy, making a good faith allegation is not expressly cause for an employee to be

---

[262] *Id.*
[263] *Id.* at 4.
[264] Def.'s Supp. Resp. to Pl.'s Interrog. & Reqs. Produc. Docs. to Def. 15, ECF No. 52-32 at 16.
[265] *Id.* at 37–38.

disciplined, let alone terminated. Further, the Policy treats suspicion of an employee's drug and alcohol use similarly, as it does confirmation of such use. A jury could infer from this that an allegation of drug use is not more serious than alcohol use under Defendant's Policy. Finally, the allegations occurred within 41 days of each other and involved the same supervisor.[266]

Next, the fact finder could determine that Plaintiff was treated differently than a similarly situated employee who engaged in conduct of comparable seriousness: she was fired and Mr. Bowcut was not disciplined. Because there is evidence from which a jury could find that Plaintiff and Mr. Bowcut were similarly situated employees who engaged in comparable conduct and who were treated differently, Plaintiff has stated a prima facie case.

In assessing Defendant's explanations for Plaintiff's termination, the court "examine[s] the facts as they appear to the person making the decision"[267] and "ask[s] only whether [the employer] honestly believed those reasons and acted in good faith upon those beliefs."[268] In her deposition, Ms. Shaffer said that Plaintiff was terminated while Mr. Bowcut was not disciplined because Plaintiff had accused another employee of illegal conduct, and her accusation was verifiably false, whereas Mr. Bowcut had not accused Plaintiff of illegal conduct, and his accusation was "unsubstantiated."[269]

---

[266] *See Kendrick*, 220 F.3d at 1234 (noting that "[d]ifferent supervisors will inevitably react differently to employee insubordination" and that "[e]mployers' disciplinary practices necessarily change over time, and it would be inappropriate for courts to penalize employers who have modified their practices over a substantial period of time [in this case, a year and a half] in an effort to better address their business needs").

[267] *Bird v. W. Valley City*, 832 F.3d 1188, 1201 (10th Cir. 2016) (quoting *Conroy v. Vilsack*, 707 F.3d 1163, 1174 (10th Cir. 2013)).

[268] *Id.* (quoting *Debord v. Mercy Health Sys. of Kan., Inc.*, 737 F.3d 642, 655 (10th Cir. 2013)).

[269] Shaffer Dep. 65:13–65:24 ("So just the fact that alcohol off the clock, off city property, is not illegal, is that the distinction between the two? A. That's a distinction, yes. Q. Is that the distinction that you are making between why Ms. Vigil was fired and Mr. Bowcut was not? A. That is -- that is one reason. The other reason is that in the case of Mr. Bowcut accusing Ms. Vigil of drinking a beer cannot be proven -- was not proven. And in the case of Ms. Vigil accusing Mr. Bowcut of smoking marijuana was provably false.").

However, there is evidence from which a jury could infer that Ms. Shaffer did not believe that the conduct of which Mr. Bowcut accused Plaintiff was legal. Around the time it happened, Ms. Shaffer emailed Mr. Bowcut and said, "[Ms. Nenni] informed me that you reported observing [Plaintiff] drinking a beer in her car while she was 'on the clock.'"[270] She received an email from Mr. Bowcut alleging that Plaintiff had been drinking "*in the main parking lot*," "during the Jr golf camp," just before driving a golf cart and teaching minors.[271] And contemporaneous to Mr. Bowcut's accusation, Ms. Shaffer informed him that it was a "very serious allegation."[272] But when Ms. Shaffer described Mr. Bowcut's accusation in her deposition, she stated that Plaintiff was *on personal property* and *off the clock*, and compared Plaintiff's actions to having a beer while at a restaurant for lunch.[273] That her deposition testimony makes Plaintiff's alleged conduct appear more acceptable and legal could be considered by a reasonable fact finder as evidence that Ms. Shaffer knew Mr. Bowcut's allegation about Plaintiff *did* involve potential illegality. Further, when confronted with Mr. Bowcut's actual factual allegations—on Defendant's property, during a camp, before driving a vehicle—a jury could infer from Ms. Shaffer's responses that she did not believe such allegations contained descriptions of policy-abiding and legal conduct:

> Q. So golf employees can drink a beer, like, on their lunch break?
> A. Yes.
> Q. On city property?
> A. No. She was in her car as I understand it.

---

[270] Email from Shaffer to Bowcut June 25, 2018, ECF No. 52-17 at 4.

[271] *See* Email from Bowcut to Shaffer June 26, 2018, ECF No. 52-17 at 6 (emphasis added).

[272] Email from Shaffer to Bowcut June 25, 2018, ECF No. 52-17 at 4.

[273] Shaffer Dep. 67:7–67:14 ("Q. So just seeing an employee drink a beer in the parking lot is not sufficient to send them for an alcohol test? A. No, it's -- I mean. It's analogous to maybe I have a beer at lunch over at the Green Pig on my time off, right? Somebody seeing me do that would not be enough for another employee to demand some kind of reasonable suspicion drug test. Q. What if you're drinking a beer on the lawn outside the city building, is that reasonable suspicion? A. I'm not sure. I'm not sure about that."); *id.* at 45:19–45:22 ("Well, beer isn't illegal and she may have been at lunch and if there wasn't any suspicion that she was impaired in any way, she's completely within her rights to drink a Bud Light in her personal property if she's off the clock.").

Q. Well, I mean her car was in the parking lot so would you consider that to be on city property?

A. I -- I would -- I think that it would be -- I think it would be a difficult thing to try and prove that something really terrible had gone on here based on this allegation.

Q. What do you -- what do you mean by 'terrible'?

A. Some major rule being broken, right? And she denied it and there were only two people involved here, so I'm not sure what the investigation showed. But if [Plaintiff] is saying I didn't drink the beer and [Mr. Bowcut] is saying, yes, you did, I don't know where that would go.[274]

[ . . . ]

Q. So just seeing an employee drink a beer in the parking lot is not sufficient to send them for an alcohol test?

A. No, It's -- I mean. It's analogous to maybe I have a beer at lunch over at the Green Pig on my time off, right? Somebody seeing me do that would not be enough for another employee to demand some kind of reasonable suspicion drug test.

Q. What if you're drinking a beer on the lawn outside the city building, is that reasonable suspicion?

A. I'm not sure. I'm not sure about that.[275]

This would permit the conclusion that one of the two reasons she gave for terminating Plaintiff—that the conduct Plaintiff alleged was illegal while the conduct Mr. Bowcut alleged was not—was pretextual.

Considering the second justification Ms. Shaffer gave as to why Plaintiff was disciplined and Mr. Bowcut was not—her allegation was "provably false" while his was "unsubstantiated"—there is evidence from which a jury could infer the difference is "unworthy of belief." While the veracity of both allegations could have been proven with a chemical test, Defendant investigated only one of the two allegations with a chemical test.[276] Mr. Bowcut

---

[274] *Id.* at 45:23–45:7.

[275] *Id.* at 67:7–67:14.

[276] "A factfinder can reasonably infer pretext not only from greater leniency to similarly situated employees but also from shortcomings in the employer's investigation." *Ibrahim v. All. for Sustainable Energy, LLC*, 994 F.3d 1193, 1199 (10th Cir. 2021).

alerted his supervisors, including Mr. Kammeyer, and H.R. to Plaintiff's alcohol consumption within minutes of having observed it. Presumably, Plaintiff could have been subjected to a chemical test to confirm whether she had been drinking while on the job and instructing minors. But despite multiple supervisors and H.R. being informed contemporaneously, Defendant did not take steps to confirm Mr. Bowcut's allegation with a chemical test. However, when Plaintiff alerted her supervisor and H.R. about Mr. Borich's drug use, Defendant took steps to confirm her allegation: Mr. Kammeyer ordered Mr. Borich to take a drug test. Defendant's additional investigation of Plaintiff's allegation proved her accusation false. Defendant terminated the employee who made the allegation Defendant proved false through the chemical test. Defendant did not punish the employee who made the allegation Defendant did not take steps to verify through a chemical test. In other words, there is evidence that both allegations were capable of being proven or disproven by a chemical test within the time frame during which Defendant received the allegation.

There also is evidence that Defendant responded immediately to Mr. Bowcut's accusation about Plaintiff's alcohol consumption, asking for details, requesting that he call H.R., and then following back up with him a few days later for a written statement describing the event, but no evidence that Defendant followed up with Plaintiff about her accusation, to ask for details or to confirm her level of certainty. A jury could infer that Defendant's failure to consult Plaintiff about her text and email, its assumption about Plaintiff's certainty, and its use of her purported certainty as part of its basis for her termination[277] demonstrates pretext.

Finally, Ms. Shaffer stated that she would have fired any employee who made a false allegation of drug use at work, even if it were the only issue in their employment history.[278]

---

[277] Shaffer Dep. 64:21–65:7.
[278] *Id.* at 72:22–73:17.

Defendant's Policy does not call for such a bright line rule; indeed, to be considered "inappropriate behavior," an employee "[f]iling a malicious, fraudulent, or frivolous complaint" must have "*the intent* to cause harm, disrupt city services, or [file the complaint] with *reckless disregard* or *intent to harass*."[279] The policy does not distinguish between complaints that are "provably false" or "unsubstantiated." The policy does not outline the potential consequences for engaging in "[i]nappropriate behavior." From this evidence, a jury could infer that Ms. Shaffer's justification for Plaintiff's dismissal is not worthy of belief.

In conclusion, there is evidence from which a reasonable fact finder could determine that the two reasons given for Plaintiff being treated differently than Mr. Bowcut—her accusation of alleged illegal conduct and that the accusation was "provably false"[280]—were not differences that Ms. Shaffer "honestly believed . . . and acted in good faith upon."[281] There is evidence that both allegations involved conduct that was treated the same under Defendant's Policy, that Ms. Shaffer did not believe either allegation to be of policy-abiding and legal nature, and that both were capable of being "provably" true or false. A reasonable jury could decide the most substantial difference between the two allegations was Defendant's response to the allegation (requesting a chemical test for Mr. Borich but not for Plaintiff), not the conduct of the employees. From this evidence, a fact finder could conclude there is both an inference of discrimination—Plaintiff was treated worse than a similarly situated employee—and pretext— Defendant's actions were inconsistent and potentially contradictory. "[R]ejection of the

---

[279] Standards of Conduct 1.
[280] Shaffer Dep. 57:5–47:15 ("Q. So what do you see is the difference between this allegation that Mr. Bowcut made against Ms. Vigil and the allegation that Ms. Vigil made against Mr. Borich? A. The allegation against Ms. Vigil is unsubstantiated. And like I said, there's – there's a big difference between an illegal substance, like marijuana was specifically pointed out, an illegal substance. So it -- if the case of Mr. Borich, the claim was that he was smoking marijuana from a pipe in the clubhouse and that is -- was found to be provably false. In the case of Ms. Vigil, at best, it would be an unsubstantiated allegation and not an illegal substance.").
[281] *Bird*, 832 F.3d at 1201 (quoting *Debord*, 737 F.3d at 655).

defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination."[282] "No additional proof of discrimination is required."[283]

Of course, a reasonable fact finder could also consider this evidence and conclude that Mr. Bowcut's conduct was not of "comparable seriousness." It could find that an allegation of controlled substance use is not comparable to an allegation of alcohol use, because alcohol use is legal in some situations while use of a controlled substance is almost never legal. It could find that, even though not material to Ms. Shaffer's decision, Plaintiff knew her allegation about Mr. Borich was false, whereas Mr. Bowcut was truthful in his allegation about Plaintiff. If it credits the evidence that supports these findings, it could determine that Mr. Bowcut's conduct in making a truthful report about another employee's alcohol use was not of "comparable seriousness" to Plaintiff's conduct in knowingly making a false report about another employee's use of a controlled substance. If Mr. Bowcut's allegation was not of comparable seriousness, then Plaintiff was not treated differently than a similarly situated employee, and there is no showing of pretext through inconsistency or contradiction.

Alternatively, or additionally, the fact finder could determine that Ms. Shaffer's legitimate employment decision was pretextual, but not a pretext for sex discrimination. For example, it could conclude that Ms. Shaffer's decision to terminate Plaintiff's employment was due to Plaintiff's numerous, unsubstantiated complaints.[284] While such a finding could result in liability under Title VII, retaliation is not a recognized basis for an equal protection claim.[285] Accordingly, such a finding would necessitate a favorable verdict for Defendant on this claim.

---

[282] *Plotke*, 405 F.3d at 1102 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)) (emphasis in original).
[283] *St. Mary's Honor Ctr.*, 509 U.S. at 511 (emphasis omitted).
[284] Shaffer Dep. 5:12–6:23.
[285] *Allstate Sweeping, LLC*, 706 F.3d at 1266 (citing *Maldonado*, 433 F.3d at 1308); *see also Long*, 840 F.2d at 752.

For the foregoing reasons, summary judgment on this claim is precluded.

**ORDER**

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment is

DENIED.

IT IS FURTHER ORDERED that Plaintiff's Partial Motion for Summary Judgment is

DENIED.

Signed June 21, 2023.

BY THE COURT

_____
David Barlow
United States District Judge

41